**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Steven Beeler,

        Plaintiff,

    v.

Union Pacific Railroad Company and
Austin Ilg,

        Defendants.

Case No. 22 C 136

Judge Jorge L. Alonso

## Memorandum Opinion and Order

Defendants Union Pacific Railroad Company ("Union Pacific") and Austin Ilg ("Ilg" and,
together with Union Pacific, "Defendants"), have moved for summary judgment on all of
Plaintiff Steven Beeler's ("Plaintiff") claims in his Second Amended Complaint. Plaintiff asserts
that Union Pacific harassed, discriminated against, suspended, and terminated him on the basis of
race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title
VII") and retaliated against him in violation of Title VII and the Family and Medical Leave Act
("FMLA"). Plaintiff asserts that Ilg, in his individual capacity, discriminated against Plaintiff on
the basis of race in violation of 42 U.S.C. § 1981. For the reasons that follow, Defendants'
motion for summary judgment [89] is granted and Plaintiff's claims are dismissed.

## Background

### I.    Evidentiary Issues[1]

As an initial matter, Defendants argue that in Plaintiff's responses to DSOF and PSOF,
Plaintiff "cherry-pick[s]" and misrepresents deposition testimony in violation of Local Rule

---

[1] The Court refers to the Defendants' statement of material facts as "DSOF" (ECF No. 91) and
Plaintiff's statement of additional material facts as "PSOF" (ECF No. 102).

56.2(d)(2). Defendants further contend that Plaintiff's response to DSOF introduces new and unsupported facts that are not responsive to the asserted fact while Defendants are restricted in their ability to dispute those facts with citations to evidence. Defendants argue that the Court should disregard Plaintiff's purportedly misleading and improperly included facts and deem admitted any of Defendants' material facts not properly controverted.

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment and states that motions to strike are disfavored. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). At the summary judgment stage, a party cannot rely on allegations; he or it must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." (internal quotation marks omitted)). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible

evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). The moving party

has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law.

*Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Where the party responding to a

properly supported fact sets forth new facts that are not fairly responsive to the asserted fact to

which the response is made, or makes improper legal arguments, such offending material will not

be considered. LR 56.1(e)(2).

The Court considers the Defendants' arguments respecting Plaintiff's responses to DSOF

and PSOF in conjunction with its analysis of Defendants' Motion. In accordance with the law set

forth above, to the extent Plaintiff fails to properly dispute any of Defendants' asserted facts, the

Court deems those facts admitted. The Court will not consider responses that set forth new facts

that are not fairly responsive to the asserted fact to which the response is made or are improper

legal argument. Furthermore, the Court will not consider Plaintiff's asserted facts not supported

by deposition testimony, documents, affidavits, or other evidence admissible for summary

judgment purposes. Where any such facts are material to the Court's analysis, the Court notes

them within this Opinion.

## II.  Factual Background

In resolving a motion for summary judgment, the Court views the evidence in the light

most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986). The following facts are taken from the record and are undisputed unless

otherwise noted.

Union Pacific is a freight-hauling railroad that operates locomotives on 32,000 miles of

routes in 23 states and is the second-largest railroad in the United States. (DSOF ¶ 3.) Plaintiff,

who is Black, began his employment with Union Pacific on July 9, 2012, and has held various

positions within Union Pacific. (*Id.* ¶ 1.) At all times during his employment Plaintiff has been a union member with employment rights governed by a collective-bargaining agreement between Union Pacific and Brotherhood of Maintenance of Way Employees Division - IBT Rail conference (the "Union"). (*Id.* ¶ 2.) Plaintiff became a track system foreman as early as December 2014. (Pl.'s Resp. to DSOF ¶ 11.)

Union Pacific is an equal opportunity employer that prohibits any discrimination or harassment based on a person's protected status (including race) or activity protected by applicable law. (DSOF ¶ 5.) Employees who believe they are being subject to or witness such behavior may report the matter by filing a complaint online or by using Union Pacific's "Values Line" hotline, a 24-hour, toll-free hotline through which employees may share concerns about the workplace and each such complaint is independently investigated and responded to by dedicated staff. (*Id.* ¶ 6.) Union Pacific is a "carrier" under the Railway Labor Act ("RLA"), and as such, its employment policies and disciplinary procedures are governed by collective-bargaining agreements between Union Pacific and unions representing various trades. (*Id.* ¶ 7.) Plaintiff was subject to Union Pacific's Managing Agreement Professionals for Success ("MAPS") Policy, which outlines the procedures under which union members (also known as "agreement employees") can be disciplined. (*Id.* ¶ 8.)

Pursuant to its policies and Plaintiff's collective-bargaining agreement, a supervisor or manager may bring discipline "charges" against a union employee for misconduct, including violations of Union Pacific's policies and procedures. (*Id.* ¶ 12.) The charges are investigated at a hearing conducted by a hearing officer where the employee is represented by their union and allowed to present evidence, and witnesses and to cross-examine Union Pacific witnesses. (*Id.*) A

reviewing officer, who is not a part of the hearing, later reviews a transcript of the hearing and any documents provided as exhibits and assesses discipline on behalf of Union Pacific. (*Id.*)

Austin Ilg began his employment with Union Pacific on January 16, 2017, and at all times during his employment has been a non-agreement ("management") employee. (*Id.* ¶ 4.) From March 18, 2019, to October 14, 2020, Ilg held a track maintenance manager position in Dolton, Illinois. (*Id.* ¶ 9.) Ilg became Plaintiff's supervisor on April 16, 2019. (*Id.* ¶ 11.) During the relevant time, Ilg's direct reports included Plaintiff, Jason Murray (Black), Michael Leith (White), Beaumont Shepley (White), Obadiah Lewis (Black), Macklain Jackson (White), Mike Gamez (Hispanic), Tajuan Riley (Black), David Mueller, Jr. (White), Robert McLeod (White), Ellis Medlin (White), Chris Bowman (White), Victor Guerrero (Hispanic), Michael Prince (Black), Shane Crawley (White), Ryan King (White), Kyle Flota (White), Tony Varela (Hispanic), and LaDon Jones (Black). (PSOF ¶ 2.) Plaintiff was the only Black foreman who reported to Ilg in 2019, and Plaintiff and Jones were the only Black foremen who reported to Ilg in 2020. (*Id.* ¶ 9.)

Plaintiff testified that although he had worked at Union Pacific since 2012, he did not have any discipline until he reported to Ilg in 2019. (PSOF ¶ 1.)[2]

### *December 9, 2019, Disciplinary Charges*

On December 9, 2019, Ilg issued Plaintiff a Notice of Investigation bringing disciplinary charges for violating Union Pacific's Attendance Policy in connection with an incident on November 12, 2019. (DSOF ¶ 13.) The parties dispute whether Plaintiff left work early that day

---

[2] Although Defendants purport to dispute this fact with Plaintiff's Employee Discipline History, they fail to provide an accurate citation to the record. *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015) ("We are not required to scour through hundreds of pages of deposition transcript in order to verify an assortment of facts, each of which could be located anywhere within the multiple depositions cited. As we have cautioned time and again, judges are not like pigs, hunting for truffles buried in the record." (cleaned up) (citation omitted)).

without authorization. Union Pacific held an investigation hearing on December 20, 2019, at which Plaintiff and Ilg testified. (*Id.* ¶ 18.) Plaintiff had union representation. (*Id.*) On January 6, 2020, reviewing officer Mark Wheeland ("Wheeland"), Assistant Vice President Track Maintenance, sustained the discipline charges and found Plaintiff's conduct constituted a First Offense violation of Union Pacific's Attendance Policy and would be "recorded in his personal record." (*Id.* ¶ 19.)

### January 2–3, 2020, Incident

In December 2019, Plaintiff was assigned a track foreman position on a night group comprised of Plaintiff, Leith, and Gamez, who operated the night shift (7:00 pm to 3:30 am). (*Id.* ¶ 21.) Gamez, a new hire, was inexperienced, and it was Ilg's expectation that as the foreman of the group, Plaintiff would lead the group and stay with the group. (*Id.* ¶ 22.) On December 4, 2019, in light of Ilg and Plaintiff's previous interactions and his attendance policy violation, Ilg conducted a one-on-one meeting with Plaintiff to remind Plaintiff of Ilg's expectations for running the group, including staying together as a group. (*Id.* ¶ 23.)

Plaintiff was on FMLA leave from January 2, 2020, to January 29, 2020, and returned to work on January 30, 2020. (PSOF ¶ 7.) Ilg was aware of these facts. (*Id.*) It is undisputed that Plaintiff was scheduled to work on Sunday, February 2, 2020—Super Bowl Sunday—for the night shift, which started at 7:00 p.m. and ended at 3:30 a.m. the following day, but that he did not work that shift. (DSOF ¶ 24.) Plaintiff texted Ilg at 4:07 p.m. on February 2 that he had a family emergency and could not come in, and that he "put FMLA in." (*Id.*) Ilg testified that Plaintiff had a right to call off and that Ilg was fine with Plaintiff doing so. (*Id.* ¶ 25.)

Plaintiff came in on February 3, 2020, for the night shift. (Pl.'s Resp. to DSOF ¶ 24.) He contends that he tried but was unable to put in FMLA for the previous day. (*Id.*) Plaintiff testified

that the time entry portal would not allow him to enter FMLA leave for the same day (*i.e.*, the early morning hours of February 3) that he was also entering working hours (for his shift beginning the night of February 3.) (Pl.'s Resp. to DSOF ¶ 30.) Plaintiff testified that Ilg knew Plaintiff was having issues with that, and that he believed the time did not have to be turned in until February 17, so Plaintiff had nearly three weeks to adjust it. (*Id.*) He put in eight hours each for February 3, 4, and 5 of that week. (Pl.'s Resp. to DSOF ¶ 24.) Plaintiff was removed from service on February 6 pending an investigation. (DSOF ¶ 34.)

### *Union Pacific's Time Entry Policies*

There are two pay periods per month, one concluding on the workday ending on the 15th and the other concluding on the last day of the month. (PSOF ¶ 5.) Wheeland testified that employees could correct any mistakes or omissions between the time they entered their time and when the manager approved it at the end of the pay half. (*Id.*) Ilg testified that he was required to review time within three days of the time closing or at any time during the pay period while it was active, although he generally reviewed time consistently throughout the month to make sure it was "going correctly." (Defs.' Resp. to PSOF ¶ 5.) Ilg further testified that whether an employee can amend time depends on if they have saved or submitted it, and that saving time indicates the employee needs to amend it, while submitting time certifies that the entered time is ready for approval. (*Id.*) Submitted time could only be recalled and amended by the employee if Ilg had not yet approved it. (*Id.*)

Employees working an overnight shift could submit their time in two ways: (1) they could submit eight hours on the second day; or (2) they could submit some hours on the first day and some hours on the second day. (PSOF ¶ 6.) If they worked a full eight-hour shift they would not be able to submit FMLA time, but if they worked anything short of eight hours, they could

submit FMLA time for the difference up to eight hours. (*Id.*) Ilg did not know if an employee could submit FMLA time on the same day that they worked. (*Id.*)

### February 5–6, 2020, Incident

On the night of February 5, 2020, Leith and Gamez called Ilg and reported that Plaintiff could not be found at his work site and that Plaintiff's assistance was needed due to a snowstorm that night. (DSOF ¶ 27.) Leith and Gamez both testified that Plaintiff left work in the middle of the night shift more than once (*id.* ¶ 28), although Gamez only reported this to Ilg once (Pl.'s Resp. to DSOF ¶ 28). Gamez testified that Ilg responded that Plaintiff is "leaving work a lot." (Pl.'s Resp. to DSOF ¶ 25.) At some unspecified date thereafter, Leith and Gamez wrote statements at the same time and in the same room regarding what had occurred. (PSOF ¶ 18; DSOF ¶ 27.) Leith testified they did not survey the property to see if Plaintiff's vehicle was elsewhere in the yard, which is approximately three to four square miles and would take about an hour to survey. (PSOF ¶ 18; Defs.' Resp. to PSOF ¶ 18.) Plaintiff tried to contact Gamez around 2:45 a.m. to pick Plaintiff up to go to the yard. (PSOF ¶ 18.) Plaintiff testified that Leith and Gamez, in turn, left him at least once (Pl.'s Resp. to DSOF ¶ 28.), and that he "was at work between February 5 and 6, 2020" (PSOF ¶ 12).[3]

Ilg testified that Leith's report that Plaintiff could not be found prompted Ilg to look at Plaintiff's time entries to see if Plaintiff had reported a full timesheet February 5. (DSOF ¶ 29.) Ilg noticed that Plaintiff had not submitted any unpaid FMLA time for his shift spanning February 2 to February 3, 2020, and that Plaintiff had inputted eight hours of straight time. (*Id.* ¶ 30.)

---

[3] Oddly, Plaintiff submits evidence that Ilg does not recall Plaintiff complaining to him that Gamez and Leith had wrongly taken a work truck. (PSOF ¶ 9.) Plaintiff does not, however, include any description of any work truck incident in his SOF. Nor does Plaintiff submit any evidence of any work truck incident, including what occurred, when, and whether and when Plaintiff reported it to Ilg. *See Friend*, *supra* n. 2.

Ilg testified that he recalled a previous time in December 2019 or January 2020 when he came to visit the site and witnessed Leith and Gamez working but Plaintiff was not present, which he felt validated their reports that Plaintiff was leaving them in the middle of the night. (*Id.* ¶ 31.) Ilg testified that he had called Plaintiff, who said he was around the corner and then showed up in his personal vehicle, which was unusual. (*Id.*) Plaintiff denies that Ilg called him. (Pl.'s Resp. to DSOF ¶ 31.)

### *February 10, 2020, Notice of Investigation*

On February 10, 2020, Ilg issued Plaintiff a Notice of Investigation letter, stating in pertinent part:

> During your scheduled shift spanning February 2 to February 3, 2020, while working as a Truck Operator 2 Tons Plus, you allegedly were dishonest when you informed your manager you were laying off FMLA yet claimed pay that you were not entitled to, for hours that you never worked. Additionally, during your scheduled shift spanning February 5 to February 6, 2020, you allegedly left work without proper authority and were dishonest when you claimed pay that you were not entitled to. The Carrier obtained knowledge of the above on February 6, 2020. If proven this is a violation of the following rule(s) and/or policy:
>
> > [General Code of Operating Rules ("CGOR") Rule] 1.6: Conduct—Dishonest
> > [CGOR Rule] 1.13: Reporting and Complying with Instructions
> > SSI Item 10-I: Union Pacific Railroad Policies
> > "The How Matters" Policy
> > [CGOR] Rule 1.6: Conduct[.]

(DSOF ¶ 35.)

Section 3.1 of the MAPS policy states:

> **3.1 <u>Conduct</u>**: Employees may be removed from service and subject to potential dismissal from employment for a single violation of Rule 1.6, Conduct or other serious policy or rule violations as listed in Appendix A.
>
> [n1] 1.6: Conduct, Employees must not be: Careless of the safety of themselves or others, Negligent, Insubordinate, Dishonest, Immoral, Quarrelsome or Discourteous. Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and

must be reported. Indifference to duty or to the performance of duty will not be tolerated.

(*Id.* ¶ 32.)[4] The MAPS Appendix A: MAPS Process Matrix lists a Rule 1.6 violation as a termination event, and Ilg testified that it was his understanding that MAPS did not provide him the option or discretion to seek suspension instead of a dismissal. (*Id.* ¶ 33.)

### *February 19, 2020, Investigation Hearing*

Pursuant to its policies and Plaintiff's collective-bargaining agreement, Union Pacific held an Investigation Hearing on February 19, 2020, at which Plaintiff had union representation and was allowed to present evidence, witnesses, and to cross-examine Union Pacific witnesses. (DSOF ¶ 36.) Plaintiff testified that there were certain witnesses and evidence that he was not allowed to present at the hearing, such as Shepley's testimony, Thorne's testimony, computer timestamps to show when he was logged in to the work computer, and GPS data from his phone. (Pl.'s Resp. to DSOF ¶ 36.)

---

[4] Although Plaintiff admits this straightforward fact in full, he further sets forth two pages of argument as to why the policy was enforced in a racially discriminatory manner. The Court has the discretion to strictly enforce Local Rule 56.1(e)(2) by declining to consider such improper argument and facts that are not fairly responsive to the asserted fact. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 644 (7th Cir. 2008) (finding district court did not err in disregarding plaintiff's response to defendant's asserted fact where it "contained several extremely long, argumentative paragraphs, and in those paragraphs he simultaneously denied the veracity of [the defendant's] proposed material facts and presented additional facts of his own"). Plaintiff cites to his two-page response in support of his SOF paragraph five. But Plaintiff may not so circumvent Local Rule 56.1(d)(5), which limits his statement of additional facts to 40 numbered paragraphs. Many of Plaintiff's 37 numbered paragraphs in his SOF contain four, five, or more asserted facts. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("The numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response."); *Basta v. Am. Hotel Reg. Co.*, 872 F. Supp. 2d 694, 700 (N.D. Ill. 2012) ("[A]dditional statement of facts must be concise, containing only one or two factual propositions per paragraph"). For these reasons, the Court disregards Plaintiff's response to DSOF paragraph 32. *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (district court did not abuse its discretion in striking responses to statement of facts because the local rule on motions for summary judgment is "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted . . . [or] by citations to the record that support legal argument rather than controvert material facts."); *Kasak v. Vill. of Bedford Park*, 563 F. Supp. 2d 864, 869 (N.D. Ill. 2008) (striking and/or disregarding for purposes of considering the motion portions of the responses that improperly inject new facts).

### *Ilg's Discipline of Other Employees*

The only employees that Ilg had issued discipline resulting in termination were Plaintiff and Riley, who are both Black. (PSOF ¶ 3.) Defendants point to Ilg's testimony that he had no discretion in the discipline meted out for Riley's violation. (Defs.' Resp. to PSOF ¶ 3.) Riley declared that Ilg, at some unspecified time, "removed [him] from a ballast regulator operator position for not being able to perform a test that was not required for the position." (PSOF ¶ 14.) It is not clear from the record whether the removal that Riley references is the same or different incident as his termination. The union reversed Ilg's decision and replaced Riley in the position. (*Id*.)

Ilg testified that he recalled Riley and Flota using FMLA leave, and that he believed that Shepley, Guerrero, Mueller, Prince, and King also either might have taken FMLA leave or had "active FMLA" while under Ilg's supervision. (PSOF ¶ 4; Defs.' Resp. to PSOF ¶ 4.) Union Pacific's records reflect that Flota, Lewis, King, Riley, Jackson, and Mueller used FMLA leave while under Ilg's supervision. (Defs.' Resp. to PSOF ¶ 4.)

### *Plaintiff's Internal Complaints to Union Pacific*

On February 18, 2020, Plaintiff utilized Union Pacific's Values Line to lodge a complaint claiming that he was unfairly pulled from service, that he did not claim any unauthorized time, that he was being targeted for termination, that this was the second time in two months that he was falsely accused of abandoning his job duties, and that Leith had tried to sabotage him and get him fired while neglecting his own duties. (DSOF ¶ 38.) At that time, Plaintiff did not allege discrimination or retaliation based on race. (*Id.* ¶ 39.)

On February 27, 2020, Plaintiff filed a second Values Line complaint, alleging that Leith was a self-proclaimed racist who had falsely reported Plaintiff for missing work. (*Id.* ¶ 40.)

Plaintiff reported that Leith stated, "They do not take their job seriously," at the Investigation Hearing, which Plaintiff understood to be aimed at Black employees. (*Id.*) Plaintiff testified in this case that during the Investigation Hearing, the hearing officer admitted that Leith was not credible, but the certified transcript from the Investigation Hearing does not reflect that the hearing officer ever made any statement regarding Leith's credibility. (*Id.* ¶ 41.)

On, March 2, 2020, Plaintiff filed a third Values Line complaint alleging specific incidents of misconduct by coworker McKlain Jackson, who is White: (1) in August 2019, Jackson threw a safety flag at Plaintiff during a verbal confrontation, and (2) in January 2020, Jackson circulated a racially insensitive "blackface emoji" in a group text message. (*Id.* ¶ 42.) Plaintiff complained that he had reported both incidents to Ilg, but Ilg did not discipline Jackson. (*Id.*) Plaintiff further complained that Ilg tends to only discipline Black employees for infractions less severe than those of their White counterparts. (*Id.*) Ilg investigated the flag-throwing incident after Plaintiff reported it to Ilg but denies that Plaintiff or Jackson ever reported any physical contact occurred. (*Id.* ¶ 43.)

Plaintiff testified that he believes that Jackson throwing the flag at him was racial harassment because Jackson never did that with Shepley, a White foreman and never questioned anybody else's authority, and because Plaintiff felt that Jackson had wanted to say the N-word. (PSOF ¶ 32.) Plaintiff testified that the flag hit his leg and foot, while Jackson denied that the flag hit Plaintiff. (DSOF ¶ 44.) Plaintiff also believed that Jackson made Plaintiff drive him around in the work van because Plaintiff is Black, because Plaintiff had heard that Jackson drove another foreman around, who was White. (*Id.*) Ilg thereafter abolished the work group, and Plaintiff did not work with Jackson ever again. (DSOF ¶ 45.) Plaintiff assumed that Jackson was

fired for violation of 1.6. (PSOF ¶ 33.) Ilg testified that he had probably abolished other work groups in 2019 or 2020 in Dolton but that he could not recall any specifically. (PSOF ¶ 13.)

Plaintiff did not know that Jackson had not been fired until Jackson sent an emoji in a group text sometime in January of 2020 that Plaintiff believes is racially insensitive. (*Id.* ¶ 33.) The emoji in question is an anthropomorphic emoji depicting a dark moon with a smiling face that was sent by Jackson in a group text of employees as part of a conversation to coordinate snow duty schedules. (DSOF ¶ 46.) Jackson denies it is a "blackface" emoji and says he sent the moon emoji to indicate that he was requesting a night shift. (*Id.* ¶ 47.) However, Jackson's testimony is ambiguous as to whether he was actually working the night shift. (Pl.'s Resp. to DSOF ¶ 47.) That was the only time Jackson recalled using that emoji. (*Id.*)

Plaintiff testified that he believes the emoji is racially insensitive because it was sent by Jackson, it has nothing to do with snow duty, typically smiling emojis are yellow, and it is all about making Black people feel low. (DSOF ¶ 48.) Plaintiff testified that he complained to Ilg that the emoji was insensitive to Black people, although he does not recall when. (Pl.'s Resp. to DSOF ¶ 49.) Ilg testified that he was unaware of any blackface emojis, that he was not on or part of a message group that had blackface emojis on it, and that he did not interpret the moon emoji as racially offensive. (DSOF ¶ 49; PSOF ¶ 8.) He testified that if someone made a report that there were blackface emojis or anything racially insensitive in the workplace he was required to report it or he would lose his job. (PSOF ¶ 8.) If those reports had been made, he would have opened a case with the Values Line. (*Id.*)

In Plaintiff's deposition, he also identified a meme depicting Michael Jackson eating popcorn in a theater that was sent in the same text thread as racially insensitive in the context of

the thread because Plaintiff believes it did not have anything to do with mandatory snow duties. (DSOF ¶ 50.)

### March 4, 2020, Charge of Discrimination

On or about March 4, 2020, Plaintiff filed a Charge of Discrimination ("March 4 Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was harassed and disciplined on the basis of his race in violation of Title VII. (*Id.* ¶ 51.) Specifically, he stated in the charge that he was removed from service without pay, pending termination on or about February 6, 2020. (*Id.*)

### March 5, 2020, Termination

The following day, reviewing officer Wheeland sustained the discipline charges against Plaintiff, dismissed Plaintiff from service, and issued Plaintiff a Notice of Discipline notifying him of his dismissal from service. (*Id.* ¶ 52.) Wheeland was not contacted by the EEO team about Plaintiff's Values Line complaints (*id.* ¶ 53) and was not aware of any of Plaintiff's complaints of discrimination (PSOF ¶ 15). Nor was Wheeland aware of the August 2019 flag incident. (*Id.*)

### April 3, 2020, Charge of Discrimination and Retaliation

On April 3, 2020, Plaintiff filed a second EEOC charge, alleging that he was discharged on the basis of his race after he complained to Union Pacific and then filed his March 4 Charge with the EEOC. (DSOF ¶ 54.)

### Notice of Right to Sue

The parties dispute when Plaintiff received notice of his right to sue ("Notice of Right to Sue" or "Notice") from the EEOC. It is undisputed that the EEOC sent Plaintiff an email on September 29, 2021, with the subject "Dismissal and Notice of Rights," which states, "Per your

14

request, the Dismissal and Notice of Rights document is attached." (DSOF ¶ 56.) Defendants

submit a screenshot of the email exchange showing the thumbnail image of a PDF attachment on

which the title of the document can be read: "Dismissal and Notice of Rights." (DSOF ¶ 56;

Defs.' Reply Mem. in Support of Their Mot. for Summary Judgment ("Reply") 4 n.3.) Plaintiff

replied, "Received, thank you." (DSOF ¶ 56; Reply 4 n.3.) Defendants point to Plaintiff's

interrogatory answers, which identify nine emails exchanged between himself and the EEOC

regarding the right to sue letter before October 21, 2021, including a September 30, 2021 "email

from EEOC with notice of rights for #440-2020-04068 and #440-2020-3281." (DSOF ¶ 56.)

Plaintiff nonetheless states in his interrogatory answers that the link to the Notice letter

was broken and that he could not open the attached document. (Pl.'s Resp. to DSOF ¶ 56.)

Plaintiff points to the EEOC's "Activity Log," which he contends "shows that although Plaintiff

downloaded the Closure Notice on October 6, 2021, at 16:21, he never viewed the Closure

Notice online, which leads [*sic*] credence to his argument that the link did not work." (*Id.*)

Plaintiff points to the Activity Log entries for "Respondent," showing that on September 23,

2021, and September 29, 2021, Respondent "viewed" the notice online, while there are no

similar entries for Plaintiff. (*Id.*) Plaintiff further argues in his response brief that Defendants lack

any evidence that Plaintiff actually received the Notice letter until October 21, 2021—the date

upon which Plaintiff states in his interrogatory answers that he received a physical copy of the

Notice letter dated October 13, 2021. (Pl.'s Resp. to DSOF ¶ 57.)

### *Plaintiff's Appeal and Arbitration*

Plaintiff's Union appealed his termination, which ultimately resulted in binding

arbitration before Public Law Board No. 763. (DSOF ¶ 61.) As part of the arbitration process, the

arbitrator, a third-party neutral, reviews the entire record in the case, including the arguments and

awards provided in support of the Union's and Union Pacific's respective positions, and conducts a hearing between the parties before issuing a judgment on the discipline decision. (*Id.* ¶ 62.)

On October 28, 2022, Public Law Board No. 763 issued Award No. 173, finding "substantial evidence of negligence on the part of [Plaintiff], but not substantial evidence of dishonesty." (*Id.* ¶ 63.) The Board concluded his dismissal should be modified to a long-term suspension and ordered Union Pacific "to reinstate [Plaintiff] to service with full seniority unimpaired, but without back pay, at MAPS training 1 status with a 24-month retention period" within 30 days. (*Id.*)

Plaintiff's award is considered a partially sustained award, which means the arbitrator found in some form that the employer was proper in their charges against the employee, but that termination may have been excessive. (*Id.* ¶ 64.) That is why the employee is allowed to return to service with seniority and benefits unimpaired. (*Id.*) Typically—as in this case—there is no requirement that the employee be returned to their former position. (*Id.*) Accordingly, Plaintiff was required to bid into a paid position following his reinstatement to service. (*Id.* ¶ 65.) By comparison, a fully sustained award is where the arbitrator has decided that the employer was in error, charged the employee incorrectly, and disciplined the employee incorrectly. (*Id.* ¶ 64.) In those awards, typically the arbitrator would order the employee returned to service in their former position, with seniority and benefits unimpaired and back pay for all time out of service. (*Id.*)

### Plaintiff's Return to Service

Union Pacific requires that any employees returning to work after an absence of 12 months or more must first complete a medical exam, drug screening, and fitness-for-duty administrative processes (hereinafter, "Return to Work Exam" or "RTW Exam"). (*Id.* ¶ 66.)

Positions requiring a commercial driver's license ("CDL") are additionally subject to Regulatory

Medical Evaluations ("CDL Exam") based on the requirements of federal and/or state

government regulations. (*Id.* ¶ 67.) A CDL Exam includes a medical exam and, under certain

circumstances, a drug screen (also known as a "FMCSA Drug Test") that are both separate from

the evaluations and testing required as part of Union Pacific's RTW Exam. (*Id.*) Employees

needing an RTE Exam or CDL Exam must schedule their medical exam and FMCSA Drug Test

through Union Pacific's third-party vendor, LHI. (*Id.* ¶ 68.) Plaintiff would have had to work

with Union Pacific's Department of Transportation ("DOT") team to know if he needed the

FMCSA Drug Test as compared to the regular drug test he took when he returned to work.

(PSOF ¶ 26.) Plaintiff would have to get in touch with the DOT compliance team by phone,

email, or through a TRM ticket, which is Union Pacific's internal ticketing system that allows

employees to ask questions and get a response from a specific department. (*Id.*)

On November 1, 2022, Union Pacific notified Plaintiff of his reinstatement to service per

Board 7633 and Award 173. (DSOF ¶ 69.) On November 28, 2022, Plaintiff was medically

cleared to return to work. (*Id.* ¶ 70.) That same day, Union Pacific issued Plaintiff a reinstatement

notice informing him that he had been "reinstated to service per Board 7633 and Award 173,"

and would be "returned to work without any work restrictions effective November 28, 2022" and

providing contact information to place himself into a position (*Id.* ¶ 71.) Plaintiff was not,

however, placed in a position at that time. (Pl.'s Resp. to DSOF ¶ 70.) Plaintiff declares that the

letter did not have the correct contact information on it, that the contact numbers were incorrect

and not working numbers, that he was not able to access the system, and that he therefore did not

have the ability to bid any jobs and was delayed in getting medical clearance. (Pl.'s Resp. to

DSOF ¶ 71; PSOF ¶ 34.) Plaintiff declares that he eventually had to receive help from the union

to have access to the system. (PSOF ¶ 34.) Union Pacific's records show Plaintiff opened two TRM tickets, one on November 23, 2020, and one on November 29, 2020, seeking assistance with logging into Union Pacific's system; Plaintiff logged into Union Pacific's system on November 30, 2022; and Plaintiff bid on two jobs on December 16, 2020. (Defs.' Resp. to PSOF ¶ 34.)

Positions covered by collective-bargaining agreements are advertised for bidding and held open for a period of two weeks. (DSOF ¶ 72.) As part of a fully automated bidding system, the most senior employee who places a bid and meets the qualifications for the position is automatically assigned to the position. (*Id.* ¶ 73.) When Plaintiff applied for two positions on December 16, 2022 (*id.* ¶ 74), Union Pacific's system sent automatic notice that he was not assigned to those positions because he was missing the required CDL qualifications (*id.* ¶ 75). An order for a CDL Exam was placed that same day. (*Id.* ¶ 76.) Had Plaintiff bid into a position that he was qualified for and been assigned to that position, he would have been able to hold that paid position until a position of his choice came available. (*Id.* ¶ 78.) There were dozens of open positions that did not require a CDL, including a position headquartered in Chicago Heights, Illinois. (*Id.* ¶ 79.)

LHI's records reflect that Plaintiff logged onto LHI's portal on December 19, 2022, provided availability for a clinic appointment for his CDL Exam—Monday afternoons—and selected a clinic location. (*Id.* ¶ 77.) Plaintiff denies telling LHI that he was only available at certain times and declares that he wanted the soonest available appointment. (PSOF ¶ 35.) The following two Mondays were the day after Christmas and the day after New Year's Day, so LHI scheduled Plaintiff's CDL Exam for Monday, January 9, 2023—the clinic's earliest available opening given Plaintiff's provided availability. (DSOF ¶ 77.) Plaintiff attended and completed

his CDL exam as scheduled, but he did not complete an FMCSA Drug Test because he did not request one. (*Id.*) Plaintiff avers that LHI did not ask him what drug tests he needed. (PSOF ¶ 35.)

On January 12, 2023, Union Pacific's DOT Compliance Department issued Plaintiff a letter notifying him that he was no longer DOT qualified pending an FMCSA Drug Test and provided instructions for scheduling the FMCSA Drug Test with LHI. (DSOF ¶ 77.) On January 26, 2023, Plaintiff's CDL Exam results were received in Union Pacific's medical system as a "pass"; however, Union Pacific's DOT Compliance Department reviewed the results and identified that a FMCSA Drug Test was needed. (*Id.*) The next day, LHI ordered an FMCSA Drug Test at Union Pacific's request. (*Id.*) Plaintiff completed his FMCSA Drug Test on January 31, 2023. (*Id.*) Plaintiff did not bid for another position until February 8, 2023, after which he was assigned to a paid truck operator position. (*Id.* ¶ 80.) Plaintiff did not receive any wages until then. (PSOF ¶ 35.)

Christopher Boganreif was one of the three members of the Board that oversaw Plaintiff's arbitration. (PSOF ¶ 23.) Boganreif advocated for Union Pacific; the other two members were from the Union and a neutral third-party arbitrator, respectively. (*Id.*) Boganreif testified that once the Public Law Board issued its award, the procedure was to "reach out to multiple groups in the company, Timekeeping, Nonoperating Personnel Services, Health and Medical . . . to let them know that an award has been rendered and that may [*sic*] be returning an employee to service" and "then we let those departments start taking their actions as far as what they need to do to return an employee to service." (*Id.* ¶ 24.) Boganreif testified that he reached out to those departments via email. (*Id.*)

On January 25, 2023, LaTrisha Frazier of Union Pacific sent an email to Boganreif and Stephanie Mahaney (also of Union Pacific) stating that a reinstatement notice was delivered to Plaintiff on December 7, 2022, and that Plaintiff bid on two jobs in December that he was not qualified for, and requesting direction on what the next steps should be. (PSOF ¶ 25.) Mahaney responded that she "need[s] to see how Bogey would respond to this since [she has] not dealt with anything like this yet." (*Id.*) Her "initial thought would be restart his 'clock' from the day he bid jobs." (*Id.*) She further stated, "We cannot awol him since he is not on a job… [I] do not know what is typically done, simply terminate?" (*Id.*) Boganreif responded,

> He was put back to work, but not ordered back to a position. Since the award was not fully sustained, and he didn't get any backpay or a bump, I believe we would just show the employee in furlough status and would have to bid back to a position that he can hold. Under the MoPac, if he is furloughed more than 365 days, we can terminate him.

(*Id.*) Boganreif testified that "furloughed" means an employee without an active position. (*Id.* ¶ 24.) When an employee goes "AWOL," they are considered as having abandoned their job. (*Id.* ¶ 25.)

### *The Instant Lawsuit*

On January 10, 2022, Plaintiff initiated this lawsuit by filing a complaint against Union Pacific and Ilg. After amendment, the operative complaint alleges Union Pacific suspended and terminated Plaintiff due to his race, in violation of Title VII (Count I); Ilg suspended and terminated Plaintiff due to his race, in violation of 42 U.S.C. § 1981 (Count II); harassment and hostile work environment based on race, in violation of Title VII (Count III); unlawful retaliation in violation of the FMLA (Count IV); and unlawful retaliation in violation of Title VII (Count V).

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322–23. To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Discussion

### I.     Title VII Race Discrimination Claims (Counts I and III)

Plaintiff had 90 days from receipt of his Notice of Right to Sue to file this action. 42 U.S.C. § 2000e-5(f)(1). "The 90-day period of limitation set forth in 42 U.S.C. § 2000e-5(f)(1) begins to run on the date that the EEOC right-to-sue notice is actually received *either by the claimant or by the attorney representing him in the Title VII action*." *Threadgill v. Moore U.S.A.,*

*Inc.*, 269 F.3d 848, 850 (7th Cir. 2001) (emphasis original) (citation omitted). "Because a failure to sue within 90 days is an affirmative defense, *cf.* Fed. R. Civ. P. 8(c)(1) (next to last bullet point), [the defendant] had the burden of showing that [plaintiff's] complaint was filed more than 90 days after she received sufficient notice of her right to sue." *DeTata v. Rollprint Packaging Prod. Inc.*, 632 F.3d 962, 970 (7th Cir. 2011). The parties disagree as to when Plaintiff actually received the Notice of Right to Sue.

The EEOC sent Plaintiff an email on September 29, 2021, with the subject "Dismissal and Notice of Rights," which states, "Per your request, the Dismissal and Notice of Rights document is attached." A screenshot of the email exchange shows the thumbnail image of a PDF attachment on which the title of the document can be read: "Dismissal and Notice of Rights." Plaintiff replied, "Received, thank you." The EEOC's Activity Log shows that Plaintiff downloaded the Notice on October 6, 2021, although Plaintiff contends that he did not actually view the Notice until he received a physical copy on October 21, 2021, because the link to the document was broken. Plaintiff points out that there is no entry in the EEOC's Activity Log that Plaintiff "viewed" the Notice online, which could merely mean that Plaintiff did not "view" the Notice while logged into the online portal—Plaintiff still could have separately opened and viewed the Notice once it was downloaded to his computer. In any event, the Court will infer in Plaintiff's favor that he did not view the Notice on October 6, 2021, upon downloading it, although that fact is ultimately immaterial.

Defendants rely upon *Paniconi v. Abington Hosp.-Jefferson Health*, 604 F. Supp. 3d 290 (E.D. Pa. 2022), *Taylor v. Nw. Mem'l Hosp.*, 521 F. Supp. 3d 714, 716 (N.D. Ill. 2021), and *Moses v. Home Depot Inc.* No. 16-2400, 2017 WL 2784710, at *6 (D.N.J. June 27, 2017), for the

proposition that an employee's electronic receipt of notification of their right to sue notice triggers the 90-day limitations period.

In *Paniconi*, the plaintiff and her attorney each received an email notification from the EEOC that provided notice of an "important document" and "inform[ed] counsel to check their EEOC portal, yet made no specific mention of the client's name or that a right to sue had been issued in this matter." 604 F. Supp. 3d at 292 (cleaned up). The plaintiff's attorney could not confirm that the EEOC portal was checked on that date to view and retrieve a copy of the right to sue letter. *Id.* The plaintiff argued that the clock for the 90-day period begins to run on the date when the individual accesses the portal and downloads the letter, not on the date when the individual receives the email notification. *Id.* The court disagreed, finding that the 90-day period began to run when the email notification reached the plaintiff's attorney's inbox and that it was irrelevant when the attorney actually followed the link to access the EEOC portal. *Id.*

In *Taylor*, the EEOC mailed the plaintiff her notice of rights on July 27, 2017, addressed correctly. 521 F. Supp. 3d at 716; *see Bobbitt v. Freeman Cos.*, 268 F.3d 535, 538 (7th Cir. 2001) ("The law presumes timely delivery of a properly addressed piece of mail."). In an affidavit, the plaintiff swore that she never received any communication from anyone at the EEOC as to the status of her 2017 charge in 2017, and so the court declined to conclude as a matter of law that she received the notice in the mail in 2017. *Taylor*, 521 F. Supp. 3d at 717. However, the activity log from the EEOC's online portal showed that the plaintiff downloaded the notice on June 10, 2018. *Id.* at 717–18. The court noted that "where, as here, delivery is shown through documentary evidence, courts have found a non-movant's bare denial of receipt insufficient to defeat summary judgment." *Id.* at 718 (citing *Rozycki v. Sophos Inc.*, No. 10 C 8000, 2012 WL 1565341, at *2–3 (N.D. Ill. May 2, 2012) (actual notice received on date USPS records showed

23

delivery); *Powell v. Ky. Fried Chicken*, No. 09-4067, 2010 WL 1687826, at *4 (C.D. Ill. Apr. 26, 2010) (same); *Mason v. United Food & Commercial Workers Int'l Unions*, No. 04 C 7148, 2006 WL 644028, at *3–4 (N.D. Ill. Mar. 7, 2006)). The court therefore concluded that the plaintiff received actual notice of her right to sue no later than June 10, 2018, and her lawsuit was untimely. *Id.*

In *Moses*, the EEOC emailed a right to sue letter to the plaintiff's email inbox on January 27, 2016. 2017 WL 2784710, at *6. The plaintiff contended that circumstances outside his control—Gmail was not working properly—prevented him from reading the email message until January 30, 2016, and so that should be deemed the date of receipt. *Id.* The court disagreed, finding that the date the email message was received in Plaintiff's inbox—January 27, 2016—is the date of receipt, and that the plaintiff's lawsuit was therefore untimely by three days. *Id.*

The Court finds *Paniconi*, *Taylor*, and *Moses* instructive. Those cases are consistent with *Lax v. Mayorkas*, wherein the Seventh Circuit found the 90-day window under 42 U.S.C. § 2000e-5(f)(1) commenced when the plaintiff received email notice, not when he opened the attached letter, and affirmed dismissal of an employment discrimination complaint that was filed one day late. 20 F.4th 1178, 1181 (7th Cir. 2021). Here, Plaintiff received electronic notice of his Notice of Right to Sue on September 29, 2021, and downloaded the Notice on October 6, 2021. Plaintiff therefore had actual notice either as early as September 29, 2021, or as late as October 6, 2021.[5] That result does not change even assuming Plaintiff could not immediately view the Notice. Under 42 U.S.C. § 2000e-5(f)(1) and pursuant to the case law, Plaintiff then had 90 days—as early as December 28, 2021, or as late as January 4, 2022—to bring suit in federal

---

[5] Defendants failed to properly cite the September 29, 2021, email in their SOF. (DSOF ¶ 56; Reply 4 n.3.) Even if the Court disregarded the September 29, 2021, email, the October 6, 2021, download yields the same result.

court. Plaintiff failed to do so, instead waiting until January 10, 2022. Accordingly, Plaintiff's Title VII race discrimination claims are untimely and must be dismissed. *Lax*, 20 F.4th at 1181.

Plaintiff alternatively argues that equitable tolling excuses his untimeliness. "Equitable tolling . . . is reserved for situations in which the claimant 'has made a good faith error (*e.g.,* brought suit in the wrong court) or has been prevented in some extraordinary way from filing his complaint in time.'" *Threadgill*, 269 F.3d at 850 (quoting *Jones v. Madison Serv. Corp.*, 744 F.2d 1309, 1312 (7th Cir.1984)). It is an "extraordinary remedy that is 'rarely granted.'" *Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016) (quoting *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013)).

Plaintiff argues that because the link was broken and there was no letter attached to his email notice, inequitable circumstances prevented him from filing in a timely manner. Courts have found similar circumstances insufficient to warrant equitable tolling. *See Lax*, 20 F.4th at 1183 (equitable tolling not warranted where plaintiff argued his inability to open and read the attached notice was not his fault but was due to technical difficulties); *Moses*, 2017 WL 2784710, at *7 (finding that "a delay solely caused by the inability to read an e-mail message is not an extraordinary circumstance that justifies equitable tolling"). Plaintiff fails to identify any good faith error or extraordinary circumstances that warrant equitable tolling of the limitations period. Plaintiff's Title VII discrimination claims (Counts I and III) are time-barred and therefore dismissed. The Court declines to consider the merits of those claims.

## II.     42 U.S.C. § 1981 (Count II)

Plaintiff brings a claim for discrimination pursuant to 42 U.S.C. § 1981 ("Section 1981") against Ilg in his individual capacity. (Second Am. Compl. ¶¶ 29–31.) Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce

contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). In the employment context, "[t]he methods of proof and elements of a Section 1981 case are essentially identical to those in a Title VII case." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (cleaned up); *see also Hogroe v. Burlington N. Santa Fe Ry. Co*., No. 16 C 2976, 2018 WL 6696563, at *3 (N.D. Ill. Dec. 20, 2018) ("The legal analysis for discrimination claims under Title VII and Section 1981 is identical."). To succeed in a Section 1981 lawsuit in the employment context, "a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan*, 724 F.3d at 995 (citing *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012)). Here, Plaintiff contends that Ilg suspended him on February 6, 2020, resulting in his termination on March 5, 2020, because he is Black.[6]

The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (internal quotation marks omitted) (citing *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). "All evidence," whether direct or circumstantial, "belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). At bottom, the "legal standard . . . is simply whether the evidence would permit a reasonable

---

[6] Plaintiff does not allege or argue that his December 9, 2019, disciplinary charges were a discriminatory adverse employment action. Any such argument is waived. *C & N Corp. v. Gregory Kane & Ill. River Winery, Inc.*, 756 F.3d 1024, 1026 (7th Cir. 2014) (finding that failure to make an argument in response to a motion for summary judgment constituted waiver); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765.

Plaintiff submits that Ilg's proffered reason for suspending him is pretextual, citing no authority on point. Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (cleaned up) (citing *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017)). To show pretext, Plaintiff must establish that Ilg's proffered reasons for his decision is "unworthy of credence." *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 807–08 (7th Cir. 2014). To meet this standard, Plaintiff "must point to evidence tending to prove that [Ilg's] proffered reasons are factually baseless, were not the actual motivation for the [decisions] in question or were insufficient to motivate his suspension and termination." *Tibbs*, 860 F.3d at 506 (internal quotation marks and citation omitted). "[T]he role of judges and juries is not to exercise our own judgment about management decisions and reasons[—i]t is to decide whether the stated reasons were or could reasonably be found dishonest." *Id.* at 507; *see also Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 725 (7th Cir. 2005) ("The parties agree that Ms. Rudin must show that there is genuine issue of material fact as to whether LLCC honestly believed its stated justification for hiring Hudson.").

Ilg removed Plaintiff from service on February 6, 2020, pending investigation, and on February 10, 2020, issued a notice of disciplinary charges against Plaintiff for (1) allegedly claiming straight pay for hours not worked during the shift spanning February 2 to 3, 2020, and (2) allegedly leaving work without proper authority for the shift spanning February 5 to February 6, 2020. Ilg further stated that if proven, these incidents violated: (1) CGOR Rule 1.6: Conduct—Dishonest; (2) CGOR Rule 1.13: Reporting and Complying with Instructions; (3) SSI Item 10-I:

Union Pacific Railroad Policies, "The How Matters" Policy; and (4) DGOR Rule 1.6—Conduct. On March 5, 2020, after a hearing at which Plaintiff had union representation and was allowed to present evidence and witnesses and to cross-examine Union Pacific witnesses, reviewing officer Wheeland sustained Ilg's disciplinary charges against Plaintiff and dismissed Plaintiff from service.[7] On appeal, the arbitration Board concluded that there was "substantial evidence of negligence on the part of [Plaintiff], but not substantial evidence of dishonesty," modified Plaintiff's termination to a long-term suspension, and ordered Union Pacific "to reinstate [Plaintiff] to service with full seniority unimpaired, but without back pay, at MAPS training 1 status with a 24-month retention period" within 30 days. Essentially, the Board found in some form that Union Pacific was proper in their charges against Plaintiff, but that termination may have been excessive.

The uncontested evidence shows that Plaintiff put in eight hours of straight time on February 3, 2020, when—from what the Court can tell in the record—Plaintiff worked at most five that day. Plaintiff therefore does not point to evidence that this first proffered reason was factually baseless. Ilg testified that by submitting time (as Plaintiff did) as opposed to saving time, Plaintiff was certifying that it was correct and ready for review; Ilg generally reviewed submitted time throughout the pay period to stay on top of it; and Ilg decided to review Plaintiff's time in response to a complaint from Leith and Gamez that Plaintiff could not be found during his shift on February 5, which Ilg thought was substantiated by a previous instance in December 2019 or January 2020, when he came to visit the work site and witnessed Leith and Gamez working but Plaintiff was not present. Although Plaintiff avers that he was "at work between February 5 to 6, 2020," he does not deny that Leith and Gamez could not find him and

---

[7] As for the identity of the decision-maker, the record permits the reasonable inference that Ilg and Wheeland both weighed in on and influenced the termination decision.

called Ilg to tell him as much, or that Ilg recalled a previous time in December 2019 or January 2020 when he visited the site and witnessed Leith and Gamez working but Plaintiff was not present.

Plaintiff contends he was still within the window of time before the pay period ended in which he could amend his time if it was incorrectly submitted. Plaintiff points out that Wheeland testified that employees could correct or amend their time before the end of the pay period, and so Ilg's decision to suspend him was premature and thereby pretextual. Essentially, Plaintiff is arguing that Ilg's proffered reason regarding the February 2 to 3 shift is insufficient to motivate his suspension and ultimate termination. *See Tibbs*, 860 F.3d at 506 ("We have recognized that an employer's explanation for discharging a worker may sometimes be 'fishy enough to support an inference that the reason must be discriminatory.'" (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)). But Plaintiff does not address the second reason Ilg gave: Leith and Gamez's complaint that Plaintiff—their foreman, who was expected to lead the work group and stay with Gamez, a new hire—could not be found on the work site during the shift between February 5 to 6, 2020. *Tibbs*, 860 F.3d at 506 (internal quotation marks and citation omitted). "Where multiple reasons are given . . . the plaintiff faces a greater challenge[;] [s]howing that just one reason was a pretext may not be enough." *Id.* (citations omitted)). Plaintiff provides no evidence that Ilg did not honestly believe Leith and Gamez's complaints.[8] *See Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005) ("It would not be appropriate for us to express a view as to whether the sanction imposed against Ballance might be perceived by some

---

[8] Although Plaintiff submitted a Value Lines complaint that Leith made a racist remark during the Investigation Hearing on February 27, 2020, Plaintiff does not discuss whether or how that fact would support his discrimination claim against Ilg. Any such argument is waived. *C & N*, 756 F.3d at 1026; *Bonte*, 624 F.3d at 466. The Investigation Hearing took place after Ilg suspended Plaintiff on February 6 and issued the Notice of Investigation on February 10, and there is no indication that Ilg was aware of any complaint by Plaintiff against Leith for racist remarks at that time. Further, Plaintiff made no allegations of racism against Gamez, who also made a complaint against Plaintiff.

individuals as more severe than the infraction justified. Our only job is to assess whether the justifications given by the police department for Balance's termination are honest. We do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." (citations omitted)).

Plaintiff further argues that would-be comparators were treated differently because employees generally believed they were allowed the opportunity to correct or amend their time entries, but Plaintiff fails to properly include any evidentiary support in his SOF or response to DSOF. *See supra* n.3; *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court"); *Bolden v. Dart*, No. 11 C 8661, 2013 WL 3819638, at *4 (N.D. Ill. July 23, 2013) ("The facts asserted in [nonmovant's] summary judgment brief are disregarded as well, as facts may be considered on summary judgment only if they are presented in a compliant Local Rule 56.1 statement or response." (listing cases)).

In any event, the only two employees that Plaintiff contends were allowed to amend their time—Shepley and Jackson—are not similarly situated. "[I]n disciplinary cases a plaintiff must show that 'the two employees dealt with the same supervisor, were subject to the same standards, *and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.*'" *Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010) (emphasis original) (quoting *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002)).

Here, Shepley testified only that he could not remember if he had ever needed to change his time but he was sure it had happened; there is no evidence as to when, whether Ilg was his supervisor at the time, or whether he violated the same rule as Plaintiff. *See Coleman*, 667 F.3d at 841 (finding sufficient commonalities between plaintiff and would-be comparators where they were disciplined by the same decisionmaker, subject to the same code of conduct, and disciplined more leniently for violating the same rule as plaintiff). Jackson testified that he forgot to enter his time once or twice and Ilg reminded him to do so—not that he submitted time for hours not worked. *Id*. Further, there is no evidence of complaints against Shepley or Jackson for disappearances from their work site during their shifts. *Tank*, 758 F.3d at 809 (would-be comparators were not similarly situated where there was no evidence they broke the rules a second time, unlike the plaintiff).

Next, Plaintiff argues that Ilg had discretion whether to apply the MAPS policy of dismissal for Rule 1.6 infractions. Plaintiff points to Shepley's testimony that an employee throwing something at a foreman would be considered disrespectful or discourteous and thereby a violation of Rules 3.1 and 1.6. Plaintiff argues that if the MAPS policy of dismissal for Rule 1.6 infractions were not discretionary, then Jackson would have been terminated for throwing a flag at Plaintiff. Plaintiff also points to Ilg's testimony that he investigated other confrontations that resulted in informal coachings or possibly a one-on-one, but nothing escalated through the MAPS process.[9]

Plaintiff does not go so far as to argue that Jackson is a similarly situated employee who was treated differently. The Court nonetheless infers that Plaintiff is attempting to argue that because Ilg in practice had discretion as to whether to apply the MAPS policy of dismissal for a

---

[9] Plaintiff does not argue that the "black face" emoji incident supports his discrimination claim against Ilg so any such argument is waived. *C & N*, 756 F.3d at 1026; *Bonte*, 624 F.3d at 466.

Rule 1.6 infraction, and because Ilg exercised his discretion to discipline Plaintiff but not

Jackson for a Rule 1.6 infraction, and because Jackson is White while Plaintiff is Black, Ilg

treated a similarly situated employee differently and so his reason for disciplining Plaintiff is

pretext for race discrimination. Plaintiff points to no evidence as to what occurred during the

"other confrontations" or the race of the employees involved, so the Court confines its analysis to

Jackson and the flag-throwing incident.

There is insufficient evidence that Jackson "engaged in similar conduct without such

differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's

treatment of [him].'" *Weber*, 621 F.3d at 594. Plaintiff only speculates that Ilg had a basis for

charging Jackson with a Rule 1.6 violation for the flag-throwing incident, and that even if

Jackson had been charged, the MAPS policy would have imposed the same constraints on the

disciplinary options available for the violation. There is no indication that Shepley has any

personal knowledge of the flag-throwing incident, and Shepley—a foreman (not a manager)—

did not actually testify regarding that incident. The Court does not "draw inferences that are

supported by only speculation or conjecture." *Washington v. City of Chicago*, 98 F.4th 860, 871

(7th Cir. 2024) (citation omitted).

For all of these reasons there is no genuine issue of material fact as to whether Ilg

honestly believed his stated reasons for suspending Plaintiff, and a reasonable jury could not find

that similarly situated employees engaged in similar conduct but were treated differently. [10]

Accordingly, summary judgment is granted in Defendants' favor on Count II.

---

[10] Plaintiff makes no argument that Riley is similarly situated with respect to any of his claims, and so any such argument is waived. *C & N*, 756 F.3d at 1026; *Bonte*, 624 F.3d at 466. In any event, there is no development of any evidence or facts with respect to Riley's termination.

### III.     FMLA Retaliation (Count IV)

The FMLA prohibits employers from retaliating against employees who engage in activity protected under the statute. 29 U.S.C. § 2615(a)(2). To prevail on an FMLA retaliation claim, a plaintiff must show he was subjected to an adverse employment action because he requested or took FMLA leave. *Guzman v. Brown Cty.*, 884 F.3d 633, 640 (7th Cir. 2018). In the FMLA retaliation context, "an employer's action is adverse 'if the action would have dissuaded a reasonable worker from engaging in protected activity.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 (7th Cir. 2023) (internal punctuation omitted) (quoting *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901–02 (7th Cir. 2018)). As for causation, "a plaintiff must demonstrate that 'the protected conduct was a substantial or motivating factor in the employer's decision.'" *Id.* (citing *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022)).

Plaintiff argues that suspicious timing and ambiguous statements permit the reasonable inference that Plaintiff's suspension and termination were caused by his FMLA leave. There is no dispute that Plaintiff's suspension and termination are adverse actions. Plaintiff was on FMLA leave from January 2, 2020, through January 29, 2020. Plaintiff then told Ilg of his intent to use FMLA on February 2, 2020, for a family emergency, and Ilg suspended Plaintiff on February 6, 2020. "That timing is suspicious, of course." *Tibbs*, 860 F.3d at 505. "The problem is that suspicious timing alone is rarely enough by itself; [a] plaintiff must ordinarily present other evidence that the employer's explanation for the adverse action was pretext for retaliation." *Id.*

Plaintiff also points to purportedly ambiguous statements: when Gamez called Ilg on February 5 to tell him that Plaintiff could not be found on the work site, Ilg told Gamez that Plaintiff is "leaving work a lot," which Plaintiff contends could refer to Plaintiff taking FMLA

leave.[11] Plaintiff cites *Gable v. Mack Trucks, Inc.*, wherein shortly after the plaintiff told her supervisor's supervisor she was going to request FMLA leave, another employee overheard the immediate supervisor complaining on the phone about a female employee's upcoming absence and slam down the phone or hit the keyboard in frustration, then saw him walk out of his office "large-eyed" and "flustered." 185 F. Supp. 3d 1055, 1058 (N.D. Ill. 2015). The court found based on the timing of the comments that a jury could reasonably conclude the supervisor was expressing frustration about the plaintiff's upcoming FMLA leave rather than another employee. *Id.* at 1061. The court found that it could not ignore that the plaintiff requested FMLA leave on her last day at work and was fired on her first day back, particularly in light of the supervisor's hostility about plaintiff taking leave. *Id.* The plaintiff also presented evidence that their stated reason for firing her (unexcused absences) was pretextual, because she testified that she gave her supervisor documentation to explain her earlier absences, yet he marked her as unexcused anyway. *Id.* And even if the absences were unexcused, the court noted that they occurred before Plaintiff took FMLA leave. *Id.* (citing *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) (A jury can infer that an employee would not have been fired but for her FMLA leave where "a supervisor who had been aware of problems with [the] employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware.")).

    *Gable* is distinguishable. Here, Ilg's statement was made in direct response to Gamez complaining on or around February 5 that Plaintiff could not be found on the work site. That caused Ilg to pull Plaintiff's time to see if Plaintiff left early that day, which in turn made Ilg

---

[11] Plaintiff also points to a statement made by Lewis to Plaintiff as purportedly ambiguous: "I'm hearing your business about you leaving for emergencies a lot of times in Chicago Heights." Lewis clarified that he had heard people in Chicago Heights discussing Plaintiff (who worked in Dolton) missing work. (Defs' Resp. PSOF ¶ 17.) There is no reasonable basis to attribute the hearsay statements Lewis overheard to Ilg because Ilg worked in Dolton.

realize Plaintiff had submitted straight time instead of FMLA time for the February 2 to 3 shift. Plaintiff's inaccurate time entry—submitting time for hours not worked—and Gamez and Leith's complaints post-dated Plaintiff's FMLA leave. This is not a case where "an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk*, 636 F.3d at 315 (finding suspicious timing—employer firing employee on the spot after reading note alleging racial discrimination—plus evidence of pretext supported a reasonable inference of causation).

Plaintiff further argues, with very little explanation, that Shepley, Leith, and Jackson are similarly situated employees that were treated differently because none had used FMLA, unlike Plaintiff. The only evidence before the Court is that Jackson did use FMLA leave while under Ilg's supervision. As for Shepley and Leith, the Seventh Circuit has "cautioned that, in order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a 'comparable set of failings.'" *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Plaintiff's evidence regarding Shepley is insufficient to show he is similarly situated, for the reasons explained in the previous section. And Plaintiff submits no evidence or argument that Leith shared Plaintiff's shortcomings, such as submitting an incorrect time entry or complaints to Ilg that Leith disappeared from his work site.

There is insufficient evidence to support a reasonable inference that Plaintiff's FMLA leave caused his suspension and ultimate termination. Accordingly, summary judgment is granted in Defendants' favor and Plaintiff's FMLA retaliation claim is dismissed.

## IV.     Title VII Retaliation (Count V)

Turning next to Plaintiff's Title VII retaliation claims, Title VII, like the FMLA, protects an employee from discrimination when "he has opposed any practice made an unlawful

employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that [1] he engaged in protected activity and [2] suffered an adverse employment action, and that [3] there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

Plaintiff's Second Amended Complaint alleges that Union Pacific failed to reinstate him until after he threatened to file a motion for leave to amend the complaint in the instant litigation to assert a retaliation claim based on Union Pacific's delay in reinstating him. (Second Am. Compl. ¶ 48.) Plaintiff alleges that he engaged in protected activity by filing a complaint in this case and that Union Pacific retaliated by delaying his reinstatement. (*Id.*) Defendants do not dispute that filing the instant litigation is a protected activity.

Plaintiff assumes, without explanation or support, that his delay in being placed in a position between November 28, 2022, and February 8, 2023, constituted a materially adverse action. Defendants disagree, also without citing any authority on point. "For Title VII retaliation purposes, a materially adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018) (cleaned up). Assuming for the purposes of analyzing this element that the employer acted with a retaliatory motive, *see Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 912 (7th Cir. 2022), a two-month delay between an employee being cleared to return to work and being placed into a position that earns wages would dissuade a reasonable employee from engaging in protected activity in the future. Accordingly, the Court finds that the second element is met.

36

Turning to causation, the Court "eliminate[s] the assumption" that Union Pacific acted with retaliatory motive and considers whether Plaintiff "offer[s] evidence that a retaliatory motive was a but-for cause of the challenged employment action." *Id.* at 915 (citation and internal punctuation omitted). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. (citation omitted).

Plaintiff first argues that there is evidence of ambiguous statements.[12] Plaintiff points out that although Plaintiff was medically cleared on November 28, 2022, and even though he did not have access to log in to the system, an employee working under Boganreif asked if they could "simply terminate" Plaintiff. Plaintiff points to evidence that it was Boganreif's job to reach out to multiple groups in the company, including time keeping, non-operating personnel services, and health and medical, to let them know that an employee may be returning to service. Plaintiff argues that the statement from Boganrief's department combined with Boganreif's "possible motive" in being slow to return an employee that he had advocated should be terminated is enough to draw an inference of retaliatory intent.

The Court disagrees that a reasonable jury could find that these facts support an inference of retaliatory intent. Plaintiff points to no evidence that Boganreif advocated during the arbitration that Plaintiff should be terminated, although it is undisputed that Boganreif advocated for Union Pacific. In any event, in late January 2023, when Mahaney asked for guidance on what to do under the circumstances (Plaintiff bidding on two positions he was not qualified for and not returning to a position) and said, "[I] do not know what is typically done, simply terminate?"

---

[12] Plaintiff cursorily mentions suspicious timing in a heading but fails to develop the issue through argument or evidentiary support. The Board did not order Plaintiff's reinstatement until October 28, 2022—over nine months after he filed the instant litigation.

Boganreif did not direct that Plaintiff be terminated. Rather, he directed that Plaintiff be placed in furlough status—meaning Plaintiff would face termination only if he remained furloughed for 365 days.

Plaintiff offers no evidence that Boganreif failed to reach out to groups in the company to let them know Plaintiff would be returning to service or delayed in doing so. The only evidence is that Boganreif did do so. And although Plaintiff contends that he was unable to access Union Pacific's system, the undisputed evidence shows that Plaintiff opened two TRM tickets, one on November 23, 2020, and one on November 29, 2020, seeking assistance with logging into Union Pacific's system; Plaintiff logged into Union Pacific's system on November 30, 2022; and Plaintiff bid on two jobs on December 16, 2020.

Further, Union Pacific's bidding system is a fully automated bidding system—the most senior employee who places a bid and meets the qualifications for the position is automatically assigned to the position. When Plaintiff applied for the two positions on December 16, 2022, Union Pacific's system sent automatic notice that he was not assigned to those positions because he was missing the required CDL qualifications. Had Plaintiff bid into a position that he was qualified for and been assigned to that position, he would have been able to hold that paid position until a position of his choice came available. There were dozens of open positions that did not require a CDL, including a position headquartered in Chicago Heights, Illinois.

It certainly could be inferred that someone—at either Union Pacific or LHI, or Plaintiff himself—should have asked the necessary questions to determine that Plaintiff needed an FMCSA Drug Test in addition to the CDL Exam. But any inferences that Boganreif is the one who failed to put the steps in motion to either inform Plaintiff he needed an FMCSA Drug Test or schedule such a test for Plaintiff, that Boganreif did so deliberately, or that he would not have

38

done so but for this lawsuit, are unsupported by the evidence and would therefore be purely speculative.

Finally, Plaintiff argues that Union Pacific's proffered reason for the delay in Plaintiff's placement in a position—that Plaintiff exclusively bid on positions that required CDL qualifications that he did not possess—is pretextual. Specifically, Plaintiff argues that he would have had to work with Union Pacific's DOT team to know if he needed the FMCSA Drug Test, and to do so he would have had to get in touch with the DOT team through calling, emailing, or a TRM ticket, but it is undisputed that Plaintiff did not have access to the system.

But it is also undisputed that Plaintiff was able to—and did—open two TRM tickets in late November to get assistance with accessing the system. Plaintiff's implication that he had no way to contact the DOT team therefore holds no water. And it is further undisputed that Plaintiff was able to access the system on November 30, 2022—within two days after being medically cleared to return to service. It is unclear why Plaintiff did not bid until December 16, 2022, but there is nothing that attributes that delay to Union Pacific. Plaintiff then chose to bid only on positions that required CDL qualifications he did not have, and immediately received notice of such restrictions via Union Pacific's automated system. Plaintiff could then have bid on one of many positions available that did not require CDL qualifications, but Plaintiff chose not to bid on another position until February 8, 2023. These facts are insufficient to permit a reasonable inference of pretext. Plaintiff fails to show evidence from which a reasonable jury could find that a retaliatory motive caused his suspension and termination.

For all of these reasons, summary judgment is granted in Defendants' favor on Count V and Plaintiff's Title VII retaliation claim is dismissed.

## <u>Conclusion</u>

The Court grants in full Defendants' motion for summary judgment [89]. Case dismissed.

**SO ORDERED.**                    **ENTERED: September 18, 2024**

 

_____
**HON. JORGE ALONSO**
**United States District Judge**